DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JAMES DAMASK,**
Appellant,

v.

**LESYA RYABCHENKO,**
Appellee.

No. 4D20-2649

[October 27, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Dina A. Keever-Agrama, Judge; L.T. Case No. 502015DR001522.

Jennifer L. Delgado, Jonathan Mann, and Robin Bresky of Bresky Law, Boca Raton, for appellant.

No appearance for appellee.

GROSS, J.

James Damask ("the father") timely appeals a post-judgment order in a paternity proceeding that, among other things, imputed gross income to him of $578,500 per year and granted an upward modification of his child support obligation. We reverse because there was not competent, substantial evidence to support the imputation of $578,500 in income.

The underlying paternity action culminated in the entry of a final judgment of paternity that ratified the parties' settlement agreements. At that time, the parties agreed that gross annual income of $35,000 would be imputed to the mother, and that the father's actual gross annual income was $578,500. The parties also agreed that the father would pay $2,000 per month in child support, which exceeded the child support guidelines.

When the circuit court entered the final judgment of paternity, the father worked as a commodity broker. About two months later, the father's employer fired him for cause for violating provisions in his employment agreement.

In October 2018, the father filed, among other things, a petition for modification of child support. The father alleged a substantial change of circumstances in that he had been terminated from his employment as a commodity broker, and he had relocated to California to build a cannabis company from which he had yet to receive an income. The trial court referred the child support issue action to a general magistrate.

The magistrate held a non-jury trial on the father's modification petition and other matters raised by the mother.

At trial, the father testified that the $578,500 income reflected in the final judgment of paternity was based on his most recent tax return at that time. The father explained that he lost his job as an institutional commodity broker under circumstances that made it difficult to find new employment in the same field, since his former employer would not be a good reference. In addition, the father testified that computer technology had reduced the number of positions available in his field, which included only six companies and thirty persons who executed the types of deals in which the father had specialized.

After six months of unsuccessfully searching for a commodity broker's job, the father started a cannabis delivery business in California. The father "sold everything" and invested in the company, for which he serves as the president and CEO. At the time of the trial, the father had not drawn a salary and there had been no distributions to shareholders.

Over the father's objection, the mother introduced a vocational assessor's report as evidence. The report opined that the father was employable at a compensation rate of at least $580,934 in South Florida and $612,380 in Los Angeles, California. The vocational assessor's opinion was based upon three sources of wage statistics, as well as the father's historical wage history between 2014 and 2017, during which time he earned between roughly $577,000 and $1.2 million per year.

The $580,934 figure was pulled directly from a wage statistic from the Economic Research Institute stating that a "Chief Executive Officer / Chief Commercial Officer" at the 75th percentile in the wholesale commodity industry in the Fort Lauderdale metropolitan area would earn $580,934 per year. The report also contained statistics showing that the median annual wage for a commodity broker is $63,990 in Florida and is $56,700 in California.

After trial, the magistrate issued a Report and Recommendations which the trial court later adopted and incorporated into a final order. Relying

upon the vocational assessor's "expert opinion" that the father's earning capacity was at least $580,934 per year, the court imputed to the father the same income he was earning at the time of the final judgment of paternity—$578,500 per year in gross income.  In light of the change in timesharing caused by the father's move to California, the court ordered an upward modification of the father's child support obligation from $2,000 per month to $2,707.41 per month beginning on January 1, 2020, consistent with the mother's petition to increase child support.

On appeal, the father challenges the imputation of $578,500 in income to him.

### Standard of Review

The standard of review governing a trial court's imputation of income for child support purposes is whether the court's findings are supported by competent, substantial evidence.  *Brown v. Cannady-Brown*, 954 So. 2d 1206, 1207 (Fla. 4th DCA 2007).

### Imputation of Income

The child support guideline amount "presumptively establishes the amount the trier of fact shall order as child support in an initial proceeding for such support or *in a proceeding for modification of an existing order for such support*, whether the proceeding arises under this or another chapter."  § 61.30(1)(a), Fla. Stat. (2020) (emphasis added).  "The guidelines may provide the basis for proving a substantial change in circumstances upon which a modification of an existing order may be granted." § 61.30(1)(b), Fla. Stat. (2020).

For child support purposes, absent a finding of incapacity or other circumstance over which the parent has no control, "income shall be imputed to an unemployed or underemployed parent if such unemployment or underemployment is found by the court to be voluntary on that parent's part[.]"  § 61.30(2)(b), Fla. Stat. (2020).  "In the event of such voluntary unemployment or underemployment, the employment potential and probable earnings level of the parent shall be determined based upon his or her recent work history, occupational qualifications, and prevailing earnings level in the community if such information is available." *Id.*

For the court to impute income at an amount other than the median income of year-round full-time workers, the party seeking to impute

income bears the burden of presenting competent, substantial evidence that

    a. The unemployment or underemployment is voluntary; and

    b. Identifies the amount and source of the imputed income, through evidence of income from available employment for which the party is suitably qualified by education, experience, current licensure, or geographic location, with due consideration being given to the parties' time-sharing schedule and their historical exercise of the time-sharing provided in the parenting plan or relevant order.

§ 61.30(2)(b)1., Fla. Stat. (2020).

"[A]lthough a trial court is free to determine the credibility of witnesses, restraints on the imputation of income exist in the form of a two-step analysis." *Vazquez v. Vazquez*, 922 So. 2d 368, 370 (Fla. 4th DCA 2006). First, the court must determine whether "the termination of income was voluntary." *Id.* Second, "the court must determine whether any subsequent underemployment resulted from the [party's] pursuit of his own interests or through less than diligent and bona fide efforts to find employment paying income at a level equal to or better than that formerly received." *Id.* (internal quotation marks omitted).

### *First Step*

The first step of the analysis for imputing income on the basis of voluntary unemployment or underemployment requires the trial court to determine whether the termination of income was voluntary.

A party's loss of employment due to misconduct is sufficient to support a finding that the termination of income was voluntary. *See Heard v. Perales*, 189 So. 3d 834, 836 (Fla. 4th DCA 2015) ("In the present case, as to the first step, the trial court found that the mother lost her employment as a result of her wrongful conduct. This finding is sufficient to support a conclusion that she was voluntarily unemployed."); *Brown*, 954 So. 2d at 1208 (affirming determination that the husband voluntarily terminated his employment as a pilot where he failed a drug test); *Vazquez*, 922 So. 2d at 370 ("We agree with the trial court that the husband's termination was voluntary because it was caused by his own deliberate repeated misconduct."); *Bronson v. Bronson*, 793 So. 2d 1109, 1110–11 (Fla. 4th DCA 2001) (affirming the trial court's finding that the husband had voluntarily "caused his termination of employment" through absenteeism);

4

*Connell v. Connell*, 718 So. 2d 842, 842–43 (Fla. 2d DCA 1998) (affirming the trial court's finding of voluntary underemployment where the husband lost his job "due to off-the-job misconduct").

Here, the trial court's finding that the father's termination of income was voluntary is supported by competent, substantial evidence. The trial court found the father's termination from employment as a commodity broker was voluntary because, as the father conceded during his testimony, it arose from his misappropriation of funds.

The father, relying on *Vazquez*, nonetheless suggests that there must be a finding of "deliberate repeated misconduct" for his termination to be deemed voluntary. However, *Vazquez* did not establish a rule that the termination of employment must be caused by "deliberate repeated misconduct." Instead, the *Vazquez* majority simply concluded that the husband's termination in that case was caused by "deliberate repeated misconduct." 922 So. 2d at 370.

While the word "voluntary" in section 61.30 implies that the misconduct resulting in termination must be deliberate, the statute does not require misconduct to be "repeated" before a trial court can make a finding of voluntary unemployment or underemployment. Termination of employment is an obvious and foreseeable consequence of misappropriating funds, even if the misappropriation occurs only once. Thus, where a parent is terminated from his or her employment for deliberate misconduct, such as misappropriation of funds, a trial court is within its discretion to conclude that the parent's resulting unemployment is "voluntary" within the meaning of section 61.30.

Finally, the father incorrectly suggests that there must be evidence "that he sought to voluntarily terminate his income to avoid paying child support." To the contrary, section 61.30(2)(b) requires only that the court find the parent's unemployment or underemployment "to be voluntary on that parent's part." Section 61.30(2)(b) does not require a finding that the reason the parent became voluntarily unemployed or underemployed is "to avoid paying child support."

### Second Step

The second step of the analysis for imputation of income requires the court to determine whether any subsequent unemployment or underemployment "resulted from the [party's] pursuit of his own interests or through less than diligent and bona fide efforts to find employment

paying income at a level equal to or better than that formerly received." *Vazquez*, 922 So. 2d at 370.

"[T]he trial court may only impute a level of income supported by the evidence of employment potential and probable earnings based on history, qualifications, and prevailing wages." *Schram v. Schram*, 932 So. 2d 245, 250 (Fla. 4th DCA 2005). The party seeking to impute income bears the burden of identifying "the amount and source of the imputed income, through evidence of income from available employment for which the party is suitably qualified by education, experience, current licensure, or geographic location[.]" § 61.30(2)(b)1.b., Fla. Stat. (2020). "Past average income, unless it reflects current reality, simply is meaningless in determining a present ability to pay. Past average income will not put bread on the table today." *Chipman v. Chipman*, 975 So. 2d 603, 609 (Fla. 4th DCA 2008) (quoting *Woodard v. Woodard*, 634 So. 2d 782, 783 (Fla. 5th DCA 1994)).

For example, in *Durand v. Durand*, 16 So. 3d 982, 985 (Fla. 4th DCA 2009), this court held that the trial court did not have sufficient evidence to impute income of $75,000 to the husband where, in addition to being terminated involuntarily, the husband "was making efforts to find new employment, such as sending his resume to a job agency and volunteering for a company he thought might hire him," and the wife "did not provide evidence that jobs were available."

Similarly, in *Chipman*, a case where the wife voluntarily left her employment as a police officer, this court held that the trial court did not "make the requisite findings concerning the wife's recent work history, her occupational qualifications, and the prevailing earnings in the community for that class of available jobs," nor did the record "contain competent, substantial evidence to support the trial court's imputation of income to the wife at the level of her most recent salary." 975 So. 2d at 608. We emphasized that the wife's "uncontradicted testimony was that she could not return to work in the same capacity," and that the husband "did not present any evidence on this issue." *Id.* at 609.

Here, the only evidence that the mother offered concerning the father's employment potential was the vocational assessment report, which was inadmissible hearsay admitted over the father's objection. *See* § 90.801(1)(c), Fla. Stat. (2020) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"); § 90.802, Fla. Stat. (2020) ("Except as provided by statute, hearsay evidence is inadmissible.").

The vocational assessor did not testify in court. Her out-of-court opinions as to the father's employability were classic hearsay. Inadmissible hearsay cannot be competent, substantial evidence. *See, e.g., B.L. v. Dep't of Child. & Families*, 174 So. 3d 1125, 1126 (Fla. 4th DCA 2015). Thus, the record did not contain competent, substantial evidence to support a finding that comparable employment was available to the father at $578,500 per year.

In this case, the trial court's findings that the father's subsequent underemployment resulted from his pursuit of his own interests or a less-than-good-faith effort to find comparable employment were not supported by competent, substantial evidence. Similar to *Chipman*, the father offered uncontradicted testimony that he could not return to work as a commodity broker in the same capacity as before. The father's unrebutted testimony established that he had worked in a very small industry of oil-and-gas commodity brokering. After losing his job, the father conducted an extensive job search for six months. However, the father's name was tarnished in the industry and those jobs were unavailable to him.

It was only after his unsuccessful job search that the father started a cannabis company in an effort to increase his income back to its previous level. Notably, the father admitted that he was considering jobs that paid between $40,000 and $60,000. But the father realized this would be insufficient to provide for his child.

Significantly, the trial court failed to make the requisite findings concerning the father's recent work history, his occupational qualifications, and the prevailing earnings in the community for commodity brokers. The mother failed to introduce competent, substantial evidence on this issue. The record does not support a finding that the father's underemployment resulted from a less-than-good-faith effort to find comparable employment as a commodity broker.

### *Conclusion*

For these reasons, we reverse that portion of the final order on modification regarding the father's requisite level of child support and remand to the circuit court for further proceedings consistent with this opinion.

*Reversed and remanded.*

MAY and DAMOORGIAN, JJ., concur.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***